**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shalanda Marie Looney, | No. CV-25-04102-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Maricopa County Office of Contract Counsel, et al., | |
| Defendants. | |

Plaintiff Shalanda Marie Looney worked as an independent contractor attorney for Maricopa County. Looney believes defendants—Maricopa County and four of its employees—discriminated against her based on her race. Looney's underlying discrimination theory is unusual in that she seems to base her claims primarily on defendants' failure to dissuade her from terminating her independent contractor agreement after she told them she intended to do so. Even if that type of failure could support claims for relief, the claims against the individuals are barred by qualified immunity and Looney has not alleged facts showing she was subjected to an unconstitutional policy or practice. The operative complaint is dismissed with leave to amend.

## I.     Factual Background

Looney "is a Black/African American attorney who provided indigent defense services as an independent contractor to Maricopa County" through the Office of Public Defense Services ("OPDS"). (Doc. 14 at 1.) Looney executed her first ten-year independent contractor agreement in 2009. (Doc. 14 at 3.) In 2019, Looney signed a second ten-year

contract. (Doc. 14 at 4.)

In 2021, defendant Rosemarie Pena-Lynch became the director of OPDS. (Doc. 14 at 24.) In 2022, defendant Ellen Hoecker assumed the position of "Managing Attorney" at OPDS. (Doc. 14 at 24.) Around that same time, defendant David Jahntz "assumed the new title and duties as contract administrator," presumably at OPDS. (Doc. 14 at 24.) Looney seems to tie her claims to these leadership changes by alleging that prior to the changes, all of her "discrimination concerns . . . were addressed promptly and without adverse consequences." (Doc. 14 at 24.)

On March 9, 2023, Looney met with Pena-Lynch, Hoecker, and Jahntz. (Doc. 14 at 13.) Looney does not allege any details regarding that meeting other than "[d]efendants demanded compliance with discretionary practices enforced selectively against [Looney]." (Doc. 14 at 13.) The following month, Pena-Lynch issued a "communication asserting that [Looney] had 'mischaracterized' the meeting." (Doc. 14 at 13.) It is not clear what this communication said, but Looney "self-referred the matter to . . . the Arizona State Bar, out of fear and emotional trauma." (Doc. 14 at 13.) The "State Bar counsel" allegedly told Looney she had not mischaracterized the March meeting, although Looney does not explain the context in which the state bar representative made this statement. (Doc. 14 at 13.) Defendants then failed to "retract the April communication," and opted to use it as "a pretext to justify discriminatory and retaliatory conduct." (Doc. 14 at 14.)

On May 2, 2023, "Pena-Lynch issued a written statement asserting that [Looney's] work 'continues to fall below OPDS expectations.'" (Doc. 14 at 5.) According to the statement, Looney needed "to adhere to a new requirement . . . to appear on video" (apparently for court hearings) and was also expected to write more professionally, stop using profanity, and change the contents of her "auto-response email." (Doc. 14 at 5.) From May 2023 to August 2023, Looney "repeatedly requested clarification, retraction, or investigation of the accusation that her work fell below OPDS' standards." (Doc. 14 at 6.) Looney alleges "[s]imilarly situated white contractors with documented performance issues were not subjected to comparable written accusations." (Doc. 14 at 6.)

- 2 -

Looney provides many examples of situations where a "white contract attorney" allegedly provided substandard representation. (Doc. 14 at 6-9.) Looney "repeatedly reported to Defendants" either the examples she lists or others involving white contract attorneys. (Doc. 14 at 9.) Looney does not provide any specifics regarding these reports, such as which of the individual defendants she spoke with or when. But she alleges the white contractors who were the subject of her complaints were never investigated or disciplined "in the same derogatory way" that she had been. (Doc. 14 at 10.) There are no allegations explaining how Looney knows the white contractors were not investigated or disciplined.

As additional evidence of disparate treatment, Looney alleges she was prohibited from appearing telephonically while white attorneys were allowed to do so. (Doc. 14 at 11.) Looney also alleges she was subjected to an "implied expectation that [she] must be liked by the judges she appeared in front of" because a judge had "excused herself from all of [Looney's] cases after [Looney] vomited in her virtual courtroom." (Doc. 14 at 11.) It is not clear what this means. But the consistent overall theme is that Looney believes she was "subjected to heightened scrutiny, negative characterizations, and adverse actions" while white contract attorneys were not. (Doc. 14 at 11.)

On October 4, 2023, Looney "submitted a 30-day notice of intent to resign, expressly stating that the resignation was due to racial discrimination." (Doc. 14 at 14.) During that 30-day notice period, unspecified individual defendants could have corrected the "discriminatory statements and conduct" but did not do so. (Doc. 14 at 14.) Defendant Kevin Tyne (the County's Procurement Officer) "had the authority to reject [Looney's] resignation on the basis" she claimed. (Doc. 14 at 15.) This appears to mean Looney believes Tyne should have rejected her resignation because it was based on racial discrimination, but he did not do so. Equating the failure to reject her resignation with discrimination, Looney alleges defendants "affirmatively chose silence . . . and allowed the contract to terminate on November 4, 2023." (Doc. 14 at 14.) Tyne sent Looney a letter on behalf of Maricopa County "setting forth a termination date of November 4, 2023." (Doc.

14 at 15.)

The primary basis of Looney's claims appears to be defendants' failure to "reject" her resignation. Looney alleges she had not suffered "a complete and definite injury" until she received Tyne's November 4, 2023, letter. Looney also alleges her "claims accrued no earlier than November 4, 2023." (Doc. 14 at 14-15.) It is not clear why Looney believes she did not have any actionable claims prior to November 4, 2023, as almost all of the discriminatory acts she complains of occurred long before that date. But Looney does allege a few events after her termination that she believes constitute retaliation based on her earlier complaints of race discrimination.

One such instance of retaliation occurred when Pena-Lynch "mailed a demand for return of payment for services." (Doc. 14 at 16.) Looney responded that "no money was owed" but also "urged Defendants to demand money from white contractors in the same way [they] did of [her]." (Doc. 14 at 16.) Defendants allegedly further retaliated against Looney in September 2025, when they "intentionally refused to assist or provide information to an alleged former Black client of [Looney]." (Doc. 14 at 21.) It is not clear what exactly occurred or why Looney believes the actions involving that former client were an attempt to retaliate against her. Finally, defendants retaliated against Looney when they "refused to fairly consider" a job application she submitted to replace Pena-Lynch. (Doc. 14 at 21.)

On November 3, 2025, Looney filed her original complaint. (Doc. 1.) On December 23, 2025, Looney filed an amended complaint, naming as defendants Maricopa County, Hoecker, Pena-Lynch, Jahntz, and Tyne. (Doc. 14.) The amended complaint alleges three claims, although it is not clear which claims are brought against which defendants. The first claim is brought under 42 U.S.C. § 1981, based on defendants interfering with Looney's right to make and enforce contracts. (Doc. 14 at 17.) The second claim is also brought under § 1981, but is based on retaliation after Looney complained of racial discrimination. And her third claim is brought under 42 U.S.C. § 1983 for defendants violating her right to Equal Protection by "subjecting her to different contracting

requirements than White attorneys." (Doc. 14 at 22.) She identifies only the third claim as brought under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). (Doc. 14 at 22.) Defendants filed a joint motion to dismiss. (Doc. 18.)

## II.    Legal Standard and Basis for Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Because Looney is a licensed attorney, the liberal pleading standard afforded to most pro se litigants does not apply. *Huffman v. Lindgren*, 81 F.4th 1016, 1020 (9th Cir. 2023). In addition, Looney purportedly brings two claims under § 1981 but her complaint admits "§ 1983 is the proper vehicle for asserting a § 1981 claim against governmental actors." (Doc. 14 at 22.) Because there is no dispute all defendants are state actors, § 1983 is the only permissible vehicle for Looney's claims.[1] *Yoshikawa v. Seguirant*, 74 F.4th 1042, 1047 (9th Cir. 2023) ("A plaintiff seeking to enforce rights secured by § 1981 against a state actor must bring a cause of action under § 1983.").

## III.    Failure to State a Claim

Defendants' motion to dismiss first addresses the alleged flaws with Looney's *Monell* claim or claims. The motion also argues there are not sufficient factual allegations

---

[1] This creates a complicated issue regarding the appropriate statute of limitations. In Arizona, § 1983 claims are subject to a two-year statute of limitations. *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 974 (9th Cir. 2004). Some § 1981 claims would be subject to that same limitations period. *Id.* Certain § 1981 claims, however, were "made possible" by the statutory changes to § 1981 in 1991, and would be subject to a four-year statute of limitations. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). Defendants do not meaningfully develop an argument regarding the statute of limitations so the court need not resolve which statute applies and whether it bars Looney's claims.

identifying what each individual defendant did, and even if there were adequate factual allegations against each individual, qualified immunity would bar Looney's claims.

### A. *Monell* Claims

"A municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). However, a municipality may be held liable for its employees' constitutional violations under § 1983 in certain circumstances. *Id.* These *Monell* claims may be proved in multiple ways, including (1) where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury"; (2) where a local government failed to train employees in a manner that was so inadequate the "policymakers of the city can reasonably be said to have been deliberately indifferent to the need"; and (3) where "an official with final policy-making authority" was the tort-feasor or ratified a subordinate's unconstitutional action. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802-03 (9th Cir. 2018) (simplified). Looney appears to be alleging the first and third theories.

Beginning with the first theory of a longstanding policy or custom, Looney vacillates on what policy or custom she is complaining about. Based on statements throughout her complaint, it appears she is alleging a policy or custom of refusing "to correct or retract discriminatory statements during the contractual notice period[,]" *i.e.*, in October 2025. (Doc. 14 at 25; *see also* Doc. 14 at 14-15 (acknowledging she did not suffer "a complete and definite injury until contract termination.").) Looney also alleges the "discriminatory acts" that occurred before her contractual notice period are pleaded only "as background evidence establishing motive, intent, and context for accrual, not as independently time-barred claims." (Doc. 14 at 27.)

To plausibly allege Maricopa County had a policy or custom of not correcting or retracting discriminatory statements, Looney would need to allege facts showing the custom was "persistent and widespread" such "that it constitutes a permanent and well settled [county] policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (simplified).

An actionable custom cannot be "predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Looney makes no such allegations. She does not cite any other instance where Maricopa County refused to "correct or retract discriminatory statements during the contractual notice period." (Doc. 14 at 25.) Without such allegations, Looney has not alleged a policy or custom under the first *Monell* pathway.

Looney's alternative path is to allege the individuals who failed to correct or retract discriminatory statements qualified as policymakers or the actions by those individuals were ratified by a policymaker. "For a person to be a final policymaker, he or she must be in a position of authority such that a final decision by that person may appropriately be attributed to the [county]." *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004). Whether someone is a policymaker is a question of state law, and ordinarily a court is "not justified in assuming that municipal policymaking authority lies somewhere else than where the applicable law purports to put it." *Id.* 982-83. Looney does not allege sufficient facts establishing Pena-Lynch, Hoecker, or Jahntz qualify as policymakers and she does not allege any facts suggesting Tyne had any knowledge of the underlying events.

Pena-Lynch was the director of OPDS, Hoecker was the "Managing Attorney," and Jahntz was the "contract administrator." (Doc. 14 at 24.) Looney argues all three of these individuals qualify as "policymakers" because they "exercised delegated authority . . . over contract administration, discipline, assignment decisions, and responses to discrimination complaints." (Doc. 19 at 8.) In other words, Looney appears to believe that these individuals qualify as policymakers because they had discretionary authority over particular decisions. But "[t]he fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481– 82 (1986). Thus, even where a city official "possessed the discretionary authority to hire and fire employees," that did not mean "he was responsible for establishing the City's

employment policy." *Gillette v. Delmore*, 979 F.2d 1342, 1350 (9th Cir. 1992). Similarly here, Looney has not provided any basis to conclude these three individuals exercised policymaking authority on behalf of Maricopa County. Looney does not cite any laws or policies conferring policymaking authority on these three individuals or people in their positions, and it is implausible that all three had such authority.

The analysis for defendant Tyne is slightly different. Tyne concedes he "is arguably in a final policymaking role." (Doc. 18 at 5.) But Tyne argues there are no allegations he "had any knowledge of Plaintiff, the manner in which her work under her contract was supervised, or her decision to end her contractual relationship." (Doc. 18 at 5.) Looney's only allegation involving Tyne is that he failed to act after receiving her resignation and instead sent a letter acknowledging the termination date of the relationship. It is difficult to see how allowing an independent contractor to terminate her relationship or sending a letter acknowledging that termination—without knowing more about allegedly discriminatory events—could constitute a constitutional tort. And if Looney is trying to allege Tyne ratified the actions of others, she would need to allege Tyne approved of the underlying discretionary decision "*and the basis for it*." *Gillette*, 979 F.2d at 1348. Looney does not point to any allegations showing Tyne was aware of any events leading up to Looney's resignation. Looney has not alleged a viable *Monell* claim.

### B. Individual Liability

Looney claims to be suing the four individuals in their individual capacities, but given her other allegations about when she was injured, it is not clear which actions by which defendants are at issue. That is, Looney alleges she did not suffer an injury until November 3, 2023, and all events prior to that date are "pleaded as background evidence establishing motive, intent, and context for accrual, not as independently time-barred claims." (Doc. 14 at 27.) The vast majority of the actions by Hoecker, Pena-Lynch, and Jahntz occurred prior to November 3, 2023. Accepting Looney's concession regarding when her claims accrued, the court looks only to events after November 3, 2023. During that time period, Looney alleges only two events involving Hoecker, Pena-Lynch, and

Jahntz and one event regarding Tyne.

At some point after November 3, 2023, Pena-Lynch sent a letter requesting Looney repay certain amounts of money. And in 2025, defendants (again, it is unclear which) "intentionally refused to assist or provide information to an alleged former Black client of [Looney]." (Doc. 14 at 21.) As for Tyne, the only action he took was issuing the November 4, 2023, letter accepting Looney's resignation. Defendants argue these claims are barred by qualified immunity.

"Qualified immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (simplified). The motion to dismiss focuses on the second step regarding clearly-established law. (Doc. 18 at 9-10.) For that step, it is the plaintiff's "burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). And "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019).

Looney has not clearly alleged which actions, taken by which defendant, are the basis for her claims, making it almost impossible to conduct a meaningful analysis. To the extent the court can understand her claims against the individuals, Looney believes it was retaliatory for Pena-Lynch to seek repayment and it was retaliatory for Pena-Lynch, Hoecker, and Jahntz to interfere with Looney's former client gaining access to files. It was also improper for Tyne to let her terminate her contract. Looney offers no authority finding a constitutional violation in remotely similar situations. Instead, Looney argues "[t]he right to be free from intentional racial discrimination and retaliation in contracting has been clearly established for decades." (Doc. 19 at 14.) That approach to the "clearly established law" requirement is the exact type of "high level of generality" approach the Supreme Court has repeatedly rejected. *Id.* (citing cases). Even assuming defendants violated a statutory or constitutional right, Looney has not established that right was clearly

established. The claims are therefore barred by qualified immunity.

### C. Leave to Amend

Looney is granted leave to amend because she may be able to state claims for relief. But if she chooses to amend, Looney must more coherently and clearly identify the exact basis for her claims, and she should not include extensive background facts that are not relevant. For example, the first amended complaint includes pages of examples of differential treatment (Doc. 14 at 6-9), but Looney explicitly states she is not basing her claims on how she was treated prior to November 3, 2023. Thus, instead of excessive background allegations, Looney must succinctly identify the factual basis for the claims she is attempting to pursue and tie them to specific defendants. *See Gibson v. City of Portland*, 165 F.4th 1265, 1289 (9th Cir. 2026) ("[i]t is not the job of the district courts to make sense of the pleading, [or] to supply facts to support the claim," and plaintiffs must "tie factual averments against specific parties to individual causes of action" to comply with Rule 8). Looney must also familiarize herself with the requirements for pleading a claim for municipal liability and include allegations making clear why she believes municipal liability exists.

**IT IS ORDERED** the Motion to Dismiss (Doc. 18) is **GRANTED WITH LEAVE TO AMEND**.

**IT IS FURTHER ORDERED** no later than **May 27, 2026**, plaintiff shall file an amended complaint. The Clerk of Court is directed to enter a judgment of dismissal with prejudice if no amended complaint is filed by that date.

Dated this 13th day of May, 2026.

Honorable Krissa M. Lanham
United States District Judge

- 10 -